IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | |
|---|---|
| IN RE: MICHAEL P. HIGGINS, Debtor | No. 4:21-bk-12706<br>Chapter 7 |
| MICHAEL P. HIGGINS | PLAINTIFF |
| v.          4:21-ap-01064 | |
| HIOB, LLC and YELLOW COMB, LLC | DEFENDANTS |

ORDER AND OPINION FINDING WILLFUL VIOLATION OF AUTOMATIC STAY AND AWARDING DAMAGES

Plaintiff Michael P. Higgins [Higgins or debtor] filed the above-captioned chapter 7 case on October 11, 2021. On October 28, 2021, the debtor filed his *Complaint for Declaratory Judgment, Emergency Ex Parte Injunctive Relief for Proceeding In Personam Against Debtor, and Damages for Violation of 11 U.S.C. § 362(a)(1)* [adversary complaint] against HIOB, LLC [HIOB] and Yellow Comb, LLC [Yellow Comb] [together, creditors]. On November 18, 2021, the creditors filed their answer. After numerous continuances at the parties' request, and resolution of certain causes of action, the trial of the remaining claim raised in the adversary proceeding was held on October 16, 2025. Vanessa Cash Adams appeared on behalf of the debtor. James R. Baxter appeared on behalf of the creditors. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court finds that the creditors willfully violated the automatic stay and awards damages to the debtor in the total amount of $4800.

**Background**[1]

Thomas DeGraff [DeGraff], a flight surgeon, is the sole member of defendant HIOB. Heather Weilbacher [Weilbacher] is the sole member of defendant Yellow Comb. For more than two decades, the debtor owned and operated elaborate haunted house attractions that generated income each year in the weeks leading up to Halloween. DeGraff and Weilbacher, who are married, became acquainted with the debtor in 2015, when they contacted him and asked to be actors at one of his haunted houses. DeGraff, Weilbacher, and Higgins shared a certain passion for Halloween, and the three became friends. In 2019, DeGraff and Weilbacher, through their respective LLCs, loaned the debtor a total of $32,000 to buy a haunted house attraction in Missouri called Phobius. The debtor signed promissory notes and gave the creditors security interests in the Phobius attraction, which consisted of seven semi-trailers' worth of costumes and equipment [Halloween UCC Collateral]. The debtor moved Phobius from Missouri and set up the attraction in Little Rock. However, due to unseasonably warm weather that year and the location of the attraction, which was widely considered dangerous and from which gunshots could be heard, Phobius was not well attended by the public and did not generate the income that the debtor had expected. As a result, the debtor was unable to repay the funds he had borrowed from the creditors and the relationship between the debtor and DeGraff and Weilbacher deteriorated. The creditors filed suit against the debtor in the Circuit Court of Pulaski County [state court] and secured a judgment and writ of execution against the debtor. On October 11, 2021, before the creditors could recover possession of the Halloween UCC Collateral, the debtor filed his chapter 7 bankruptcy case.[2]

---

[1] Some of the background facts in this section are based on evidence introduced during the October 20, 2021 hearing on the creditors' motion for relief from stay. *See Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990) ("[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case . . . .")

[2] Although the debtor's chapter 7 case was dismissed on May 3, 2022, actions for damages based on violations of the automatic stay are not rendered moot by dismissal of the underlying bankruptcy. *See, e.g., In re Williams*, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001) and *Davis v. Courington* (*In re Davis*), 177 B.R. 907, 911 (B.A.P. 9th Cir.1995).

On October 20, 2021, the Court held a hearing on the creditors' motion for relief from stay [the 2021 hearing], at which DeGraff, Weilbacher, and the debtor each testified at length. During the 2021 hearing, the debtor testified that he did not know where all of the creditors' collateral was located, explaining that two years earlier (in 2019), his former landlord had seized much of his personal property, including property that was collateral for the creditors' loans to him.³ At the conclusion of the October 20, 2021 hearing, the Court delivered a verbal ruling in which it granted the creditors relief from the stay as to the Halloween UCC Collateral and the certain other items that the debtor had agreed to give the creditors [additional items]. In its ruling, the Court made clear that the stay was not lifted in any other regard. At 9:30 a.m. on October 21, 2021, the Court entered a written order incorporating by reference its findings of fact and conclusions of law as recited on the record the day before. The written order, which was drafted by and submitted to the Court by the creditors' counsel at the time (Frank Falkner and Lyndsey Dilks), stated that "the Motion for Relief is GRANTED . . . as to the 'Halloween UCC collateral' and the specific items that the debtor testified the creditors could have[.]" (Dkt. No. 24.) Neither the creditors' motion for relief from stay nor the order drafted by their counsel and entered by the Court included a provision lifting the stay for the creditors to seek a body attachment or, more generally, to pursue all available "state law remedies" in regard to Halloween UCC Collateral or the additional items.⁴

At 9:59 a.m., approximately thirty minutes after this Court entered the order lifting the stay, the creditors filed their *Emergency Ex Parte Motion/Petition for Order of Delivery* in state court that referenced the hearing held by this Court the day prior and stated "Plaintiffs were granted relief from stay to pursue their state law remedies against the

---

³ The debtor's former landlord asserted a lien on the same property that was collateral for HIOB's and Yellow Comb's loans to the debtor. HIOB and Yellow Comb filed a lawsuit in state court against the landlord. Their lawsuit against the landlord, though related to their suit against Higgins, did not name him as a defendant.

⁴ In this Court's experience, it is not uncommon for movants to include requests to pursue all state law remedies in motions for relief from stay that seek recovery of collateral.

3

secured collateral." (Dkt. No. 1-3.)[5] In paragraph 10, the creditors quoted Arkansas Code Annotated section 18-60-807, which provides:

> If the petitioner for an order of delivery, after otherwise complying with the requirements for issuance thereof, shall present evidence to the court that there is genuine danger that the property sought under the order will be removed from the court's jurisdiction, damaged, concealed, or otherwise jeopardized, the court shall have the power to direct the immediate appearance of the party having possession thereof or, if the party cannot be immediately served but the property can be located, to direct that the property be taken and impounded pending further hearing, in which event it shall be deemed in custodia legis, subject to possession by neither party without further order of the court.

Ark. Code Ann. § 18-60-807. In paragraph 11, the creditors alleged:

> [b]ecause there is genuine danger that the secured collateral sought will be removed from the court's jurisdiction, damaged, concealed, or otherwise jeopardized has been concealed, or otherwise jeopardized the Court should issue the Order for Delivery Forthwith and order the Pulaski County Sheriff s Office to serve and execute the Order [f]or [D]elivery with all due speed.

(Dkt. No. 1-3.) As an exhibit to their *Emergency Ex Parte Motion/Petition for Order of Delivery*, the creditors attached an affidavit executed by Weilbacher, in which she averred:

> I, Heather Weilbacher, do hereby swear under oath and penalty of perjury the following:
> l. I am over 18 years of age and competent to make this affidavit.
> 2. I am the Managing Member of Yellow Comb, LLC and have personal knowledge of the facts in the above captioned case.
> 3. I observed Michael Higgins removing property from 2616 S Shackleford Rd, Little Rock, AR 72205 after Michael Higgins got notice of the Writ of Execution on October 6,2021. I also videotaped it and took several pictures. I presented this evidence at the hearing in Hot Springs Arkansas by and through my attomey [sic] on October 20,202l, to the bankruptcy court.

---

[5] *See United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (federal courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); *see also In re Cashion Family Tr.*, 669 B.R. 341, 378 (Bankr. D. Nev. 2025) (a court may . . . take judicial notice of pleadings filed on its own docket).

4

(Dkt. No. 1-3.)

On October 28, 2021, the state court entered its *Order on Emergency Ex Parte Motion/Petition for Order of Delivery* that, among other things, granted the creditors' request for a body attachment, providing:

> [a]dditionally, because the Plaintiff filed an additional affidavit that she believes the property has been concealed, removed, or disposed of in a way with intent to defeat the Plaintiffs' action[,] the Pulaski County Sheriff shall, if the property mentioned in this *Order on Emergency Ex Parte Motion/Petition for Order of Delivery* cannot be had, to take the body of Michael Higgins, so that he appear at the return day of the order to answer the premises.

Pl.'s Ex. 2.

Also on October 28, 2021, and in response to the issuance of the body attachment, the debtor filed this adversary proceeding, alleging, among other things, that "based on the circuit court's Order allowing for a body attachment against the debtor, allowing HIOB, LLC and Yellow Comb, LLC to collect against [the] debtor, *in personam*, debtor hereby requests *ex parte* temporary injunctive relief until a hearing on the merits can be scheduled by the Court." Compl. ¶ 17. The debtor also alleged in his complaint that the creditors "should be enjoined from proceeding against the debtor *in personam*, in violation of the automatic stay, and beyond this Court's *Order Granting Relief from the Automatic Stay*." Compl. ¶ 18.

On October 29, 2021, the creditors filed an *Emergency Ex Parte Motion for Determination of the Applicability of Automatic Stay* in state court. In the motion, the creditors stated that Higgins had alleged that the body attachment violated the automatic stay but that the creditors "do not believe the Order, or the seeking of the Order, is or was a violation of the stay as [creditors] contend: 1) they have relief from stay to go after the collateral; and/or 2) [creditors] believe the Order is in the nature of a criminal contempt proceeding." Defs.' Ex. 2. The creditors asked the state court to determine whether the body attachment was "in the nature of criminal contempt proceedings, civil contempt proceedings, or some other proceeding(s)," and whether proceeding with the body

5

attachment violated the automatic stay. In the event the court determined the body attachment was a violation of the stay, the creditors asked the court to issue the alternate order they had submitted. As of November 3, 2021, the state court had neither ruled on the motion nor entered the alternate order that did not contain the body attachment language.

On November 3, 2021, the Court held a telephonic hearing on the portion of the debtor's complaint that sought emergency ex parte injunctive relief. Vanessa Cash Adams appeared on behalf of the debtor. Falkner and Dilks appeared on behalf of the creditors. Falkner asserted in his opening statement that the body attachment did not violate the automatic stay but, in an abundance of caution, thirty-three minutes before the order was to be executed, the creditors advised the deputy not to proceed.[6] In response to the Court's inquiry at the conclusion of the parties' opening statements, creditors' counsel agreed that the creditors had no objection to this Court entering an order granting a preliminary injunction regarding the enforcement of the last clause of the state court's October 28, 2021 order. Based on the creditors' agreement, and for the reasons stated on the record at the conclusion of the November 3, 2021 hearing, the Court granted the debtor's prayer for injunctive relief pursuant to 11 U.S.C. § 105(a) in order to carry out the provisions of 11 U.S.C. § 362 and to enforce the terms of the Court's October 20, 2021 order and enjoined the provision of the state court's October 28, 2021 order that allowed for a body attachment against the debtor. The Court ordered that the preliminary injunction remain in effect until a trial on the merits of the underlying adversary complaint. Defs.' Ex. 3. The trial was held on October 16, 2025.

---

[6] The Court has no evidence to support Falkner's assertion that the creditors communicated with the deputy sheriff in this regard.

Neither DeGraff nor Weilbacher appeared for the October 16 trial.[7] Creditors' current counsel, Mr. Baxter, stipulated that the body attachment order was drafted and submitted to the Pulaski County Circuit Court by the creditors' former counsel. The debtor appeared on October 16 and testified that he has a twelfth-grade education by virtue of an adult education diploma. He also testified that he has several medical conditions, including depression, anxiety, and diabetes,[8] which he believed the creditors and their former counsel were aware of when they sought and obtained the body attachment order. The debtor learned of the body attachment order from his attorney. He testified that the body attachment caused him to experience anxiety and resulted in the specific fear that he was going to be arrested. The debtor's fear of being arrested was exacerbated by the fact that, shortly after the body attachment order was issued, he had to travel from his residence in Maumelle to an attorney's office in Saline County to attend a deposition for which he had been subpoenaed.[9] Throughout the October 16 trial, the debtor struggled to recall exact dates, including the date of the deposition he was subpoenaed to attend while the body attachment order was in effect. In response to Mr. Baxter's questions on cross examination, the debtor testified that he remembered that it was cold, raining, and sleeting the day of the deposition. His memory of the weather initially caused the debtor testify—albeit with obvious uncertainty—that the deposition could have been in late November or December of 2021. However, on redirect, he testified that there had been several depositions during the state court litigation and the specific deposition that he had been afraid to attend in Saline County had taken place on October 29, 2021—one day after the body attachment was issued on October 28, 2021. Despite his fear of being arrested, the debtor complied with the subpoena and attended the deposition. The debtor

---

[7] Creditors' counsel represented to the Court that the creditors did not appear at trial because of "illness." The Court notes that it has granted both parties' previous requests to continue this trial and had the creditors wished to be present at trial, they could have requested another continuance but did not.

[8] The debtor also testified that he has had six surgeries but did not say when the surgeries took place or what condition or conditions had precipitated them.

[9] The deposition was in connection with the creditors' lawsuit against the debtor's former landlord.

testified that Falkner, the creditors' former counsel, also attended the deposition. Higgins testified that Frank Falkner was "not a nice guy" and said he was especially afraid of being arrested at the deposition when Falkner "ripped off his mic[rophone] and started threatening everybody." Higgins additionally testified on direct that the body attachment order caused a great deal of turmoil in his family and his relationships and resulted in him losing his girlfriend of twenty-two years, his birds,[10] and his apartment. However, he later clarified that these losses did not flow directly from the body attachment order but were instead the cumulative result of the creditors' lawsuit in state court, DeGraff and Weilbacher going to his then-girlfriend's workplace and threatening her,[11] and the stress of the bankruptcy process in general.

During cross-examination, Mr. Baxter asked the debtor whether he had a good lawyer, and the debtor replied in the affirmative. Mr. Baxter then asked the debtor whether he had "the utmost faith and trust in [Ms. Cash Adams]" and the debtor confirmed that he did. The debtor testified in response to Mr. Baxter's questions that he was not personally served with the body attachment but instead found out about it from Ms. Cash Adams and received a copy of the order from her. Mr. Baxter then asked the debtor whether he was "still worried" about the body attachment order "even after" he spoke with his attorney.[12] The debtor testified that he was. In response to Mr. Baxter's further inquiry regarding

---

[10] For context, the debtor testified during the 2021 hearing that he had two Macaws that he had raised since they were babies.

[11] Because the record does not reflect when DeGraff and Weilbacher went to the debtor's girlfriend's workplace and threatened her, which was presumably motivated by their protracted dispute with the debtor and therefore indirectly aimed at him, the Court is unable to determine whether the creditors' actions in regard to the debtor's girlfriend violated the automatic stay.

[12] These questions seemed designed to suggest that Ms. Cash Adams had a duty to mitigate the damaging effects of the creditors' actions by explaining to the debtor that such actions were in violation of the stay. Although debtors do a have a duty to mitigate damages relating to stay violations, *see Yantis v. GLHS Unity Surgical Ctr.* (*In re Yantis*), 553 B.R. 351, 355 (Bankr. N.D. Ind. 2016), there is no evidence to indicate that even had the debtor understood that the body attachment was not "legal" that such an understanding would have lessened his anxiety and fear of arrest.

8

whether the debtor believed that the body attachment was "legal," the debtor testified that he believed it was legal because "the paper said it."

Mr. Baxter also asked the debtor whether he had been to jail in the past, which drew a relevance objection from the debtor's attorney. In response to the objection, Mr. Baxter argued that "it goes to show his damages. If he has been to jail several times, it shouldn't be this giant fear that he just testified that it was . . . I think if he goes to jail before it diminishes his mental distress claim." The Court overruled the objection and the debtor testified that he had been in jail twice before for misdemeanors. During his cross examination, Mr. Baxter pointed out to the debtor that the body attachment would have been triggered only if he did not return all of the collateral to the creditors. In reply, the debtor testified that he did not know where the collateral was.

**Findings of Fact and Conclusions of Law**

Eleven U.S.C. § 362(a) "provides that the filing of a bankruptcy petition operates as a stay of all actions to, among other things: collect a claim against the debtor that arose prepetition; enforce a prepetition judgment against the debtor or property of the estate; take acts to obtain possession of property of estate or to exercise control over property of the estate." *James v. Planters Bank* (*In re James*), 257 B.R. 673, 677 (B.A.P. 8th Cir. 2001). Section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). "The automatic stay serves a crucial function in any bankruptcy case and willful violations . . . are serious matters warranting the mandatory imposition of sanctions that Congress has proscribed." *In re Lyle*, 662 B.R. 229, 234 (Bankr. E.D.N.C. 2024) (quoting *In re Brock Util. & Grading, Inc.*, 185 B.R. 719, 720 (Bankr. E.D.N.C. 1995)). "Courts must display a 'certain rigor in reacting to violations of the automatic stay' in order to maintain its effectiveness." *In re Anderson*, 430 B.R. 882, 887 (Bankr. S.D. Iowa 2010) (quoting *LaBarge v. Vierkant* (*In re Vierkant*), 240 B.R. 317, 321 (B.A.P. 8th Cir. 1999)). A "party seeking damages for a stay violation must establish that: (1) a violation occurred; (2) the violation was committed willfully, [and] (3) the

9

violation caused actual damages." *Hampton v. Yam's Choice Plus Autos, Inc.* (*In re Hampton*), 319 B.R. 163, 170 (Bankr. E.D. Ark. 2005) (citations omitted).

The Court must first determine whether the creditors violated the automatic stay by seeking and obtaining the body attachment order. The stay relief granted by this Court on October 20, 2021, was specifically confined to the creditors' recovery of the Halloween UCC Collateral and the additional items that the debtor had agreed to give them. The creditors never asked this Court to lift the stay so that they could seek and obtain a body attachment order in state court, and the Court did not lift the stay for such a purpose. Yet, less than twenty-four hours after this Court granted the creditors relief from the stay solely to recover their collateral, they filed an emergency, ex parte motion in which they petitioned the state court to issue a body attachment for the debtor pursuant to Arkansas Code Annotated section 18-60-807. The creditors supported their petition with Weilbacher's affidavit, in which she averred facts consistent with the statutory prerequisites for requesting a body attachment. The body attachment, which was issued on October 28, 2021, was immediately effective upon the sheriff's determination that the Halloween UCC Collateral and additional items could not be recovered. The creditors heard the debtor testify on October 20, 2021, that he did not know where all of the creditors' collateral was located. Therefore, the order did not merely authorize a body attachment but required it, stating that the sheriff "*shall*, if the property mentioned in this Order [] cannot be had, [to] take the body of Michael Higgins, so that he may appear at the return day of the order to answer the premises." The Court finds that the creditors violated the stay by seeking and obtaining the body attachment.[13] *See In re Ebadi*, 448

---

[13]  The creditors alleged in their state court *Emergency Ex Parte Motion for Determination of the Applicability of Automatic Stay*, and argued to this Court on November 3, 2021, that the body attachment was in the nature of criminal contempt and therefore did not violate the automatic stay. However, this argument was not pursued by creditors' counsel during the October 16 trial and, regardless, would have failed. Arkansas Code Annotated section 18-60-807, under which the creditors sought and obtained the body attachment, appears in Title 18 Property under Subchapter 5 Civil Actions and is civil in nature, not criminal—it is aimed at obtaining compliance with a court order rather than punishing noncompliance. *See Blalock v. Blalock* (*In re Blalock*), 5:12-ap-7057, 2013 WL 12384034, at *3 (Bankr. W.D. Ark. Feb. 11, 2013) (finding that the state court issued a body attachment in the event certain payments were not made,

B.R. 308, 318 (Bankr. E.D.N.Y. 2011) ("[a]n action that is at least partially *in personam* against a debtor . . .is stayed by the Bankruptcy Code, and continuing such an action constitutes a violation of the automatic stay. 11 U.S.C. § 362(a).")

Next, the Court must determine whether the creditors' violation of the stay was willful. "'[A]n act is deemed to be a willful violation if the violator knew of the automatic stay and intentionally committed the act *regardless of whether the violator specifically intended to violate the stay*.'" *In re Anderson*, 430 B.R. at 888 (quoting *In re Preston*, 395 B.R. 658, 663 (Bankr. W.D. Mo. 2008). "Even an innocent stay violation, i.e., one committed without knowledge of a stay, will become 'willful' if a creditor fails to remedy the violation after receiving notice of the stay." *In re Swindle*, 584 B.R. 259, 265 (Bankr. N.D. Ill. 2018). Importantly, this is not a case in which the creditors were unaware the automatic stay was in place. To the contrary, the creditors had spent several hours the day before they sought the body attachment litigating their entitlement to stay relief. During the October 16 trial, creditors' counsel argued that even if the body attachment was a violation of the stay, it was not willful because they immediately attempted to remedy their "mistake." The Court disagrees. The creditors purported attempt to remedy their violation of the stay was in the form of the motion they filed on October 29, 2021, in which they sought a ruling from the state court regarding whether the body attachment violated the stay.[14] However, in their motion, the creditors maintained that they had not violated the stay. In addition, there is no evidence that the state court ever ruled on that motion or that it entered the alternate order that did not contain the body attachment language. Further, the Court's record does not show that the creditors ever asked the state court to vacate the body attachment order nor did they enter into an agreed order enjoining the execution of the body attachment after the debtor filed this adversary proceeding. Rather the creditors allowed the body attachment order to

---

which was coercive and therefore civil in nature).

[14] It is unclear why the creditors did not seek clarification from this Court, which was arguably in a better position than the state court to clarify the scope of the relief it had granted.

11

remain in effect for six days, until this Court enjoined its enforcement on November 3, 2021. Although the creditors did not oppose the injunction during the November 3 hearing, they took no steps before the November 3 hearing to remedy their violation of the stay. *See In re Kuzniewski*, 508 B.R. 678, 686 (Bankr. N.D. Ill. 2014) ("[f]ailure to take 'reasonable steps' to remedy a prior stay violation in itself violates the automatic stay.") ; *see also Smith v. Albert* (*In re Smith*), 111 F.3d 133, n.2 (7th Cir. 1997) ("creditor has an affirmative duty to undo acts which violate the stay . . . .").[15]

Pursuant to § 362(k), the debtor is entitled to recover damages caused by the creditors' willful violation of the stay. Damages for emotional distress are recoverable as actual damages under § 362(k). *In re Weathers*, 670 B.R. 20, 36 (Bankr. D.S.C. 2025). "The Bankruptcy Appellate Panel for the Eighth Circuit has held that '[e]motional distress damages for automatic stay violations are available if the individual debtor puts on clear evidence establishing that significant harm occurred as a result of the violation.'" *In re Anderson*, 430 B.R. at 888 (quoting *L'Heureux v. Homecomings Fin. Network*, 322 B.R. 407, 411 (B.A.P. 8th Cir. 2005). However,

> [a] debtor is entitled to damages only if he or she can show a "specific discernable injury to [his or her] emotional state, proven with evidence regarding the nature and extent of the harm." [] Corroborating evidence of emotional distress is not required, "but only if the testimony [of the debtor] is particularized and extensive enough to meet the specificity requirement." [] In addition, there must be a reasonable relationship between the willful violation and the emotional injury. *Clayton*, 2010 WL 4482810, at *3.

*In re Adams*, 516 B.R. 361, 371 (Bankr. S.D. Miss. 2014). In this case, the Court finds credible the debtor's testimony that he experienced anxiety and the specific fear of being

---

[15] Although the creditors stipulated that the body attachment order was drafted and submitted by their former counsel, any reliance the creditors may have had on Falkner or Dilks is no defense to their willful violation of the stay, particularly when Weilbacher executed an affidavit for the specific purpose of satisfying the statutory prerequisites for obtaining a body attachment. *See Achterberg v. Creditors Trade Assoc., Inc.* (*In re Achterberg*), 573 B.R. 819, 831 (Bankr. E.D. Cal. 2017) ("[i]t is well established that an 'ignorance of the law' or advice of counsel is not a *bona fide* defense to a willful violation of the automatic stay.")

arrested when he learned of the body attachment order on October 28, 2021. This emotional distress was directly caused by the body attachment order. The debtor's resulting anxiety and fear was heightened by the fact that he had been subpoenaed to attend a deposition on October 29, 2021—which the creditors were aware of because the subpoena was issued in connection with their lawsuit against the debtor's former landlord. Despite his fear of arrest, the debtor attended the deposition while the body attachment order was in effect. Once at the deposition, the unrebutted testimony is that Falkner behaved aggressively and made threats, which justifiably intensified the debtor's anxiety and fear that he would be picked up by the sheriff. Falkner had obtained the body attachment for the creditors and it was reasonable for the debtor to believe that Falkner, who was agitated, could have prompted the sheriff to execute it at the deposition.[16] The Court finds that there is a reasonable relationship between the creditors' willful violation of the stay and the debtor's emotional distress.

Regarding the appropriate measure of damages for emotional distress under § 362(k), there is no "legal yardstick." *In re Lyubarsky*, 615 B.R. 924, 933 (Bankr. S.D. Fla. 2020). The debtor did not argue for a particular amount. There was also not extremely specific testimony from the debtor about the extent of these harms on his life and health. However, based on the Court's observations of the debtor at the trial, more specific testimony did not appear possible due to the debtor's overall health, which appeared to be quite poor and had declined significantly since the Court last saw the debtor at the October 20, 2021 hearing. The Court's impression of the debtor's overall health combined with the specific medical problems the debtor testified that he has, the Court finds that the debtor was unable to offer more specific testimony than he did, and he should not be penalized for that. Further, while there was no expert witness to testify as

---

[16] To address Baxter's argument that, because the debtor had been jailed in the past, the prospect of it happening again should have been minimally distressing to him, the Court believes the opposite is equally, if not more, plausible—because the debtor had experienced jail firsthand, the prospect of being forcibly returned there could have engendered even more fear and distress than it might have in someone who had not already endured such an experience.

13

to the full extent of such harms, these alleged harms are not so technical as to require one. Here, the testimony the debtor was able to provide was credible, especially because these particular creditors have displayed unusually high hostility toward this debtor throughout this case, and it is sufficient to warrant a modest award of emotional distress damages,

For these reasons, and based on the debtor's testimony, the record before the Court, and the history of this case, the Court awards the debtor $1800 in emotional distress damages, representing $300 per day for the six days in which the body attachment order was in effect.

Although § 362(k) also provides for the award of attorney fees and costs, the debtor provided no evidence in this regard and the Court cannot speculate about the amount the debtor might owe his attorney for prosecuting this adversary proceeding on his behalf. Finally, § 362(k) permits the award of punitive damages in "appropriate circumstances." 11 U.S.C. § 362(k)(1). The Eighth Circuit has interpreted "appropriate circumstances" to mean those in which there has been "egregious, intentional misconduct on the violator's part." *United States v. Ketelsen* (*In re Ketelsen*), 880 F.2d 990, 992 (8th Cir. 1989). The creditors submitted a body attachment order to a different court the day after this Court limited the pursuit of such a remedy. This conduct is plainly egregious conduct and the undisputed evidence is that it was intentional because the creditors sought it by affidavit. This is not a circumstance of a typographical or electronic error. There was no testimony that this Court's order was confusing to the creditors. There was also not testimony by the creditors that they had any remorse or understood why their actions were wrong. For this conduct, the Court finds a punitive damage award of $3000 is sufficient to deter these creditors from such behavior in the future.

**Conclusion**

For the above-stated reasons, the Court finds that the creditors willfully violated the automatic stay and the debtor is entitled to actual damages in the amount of $1800 and punitive damages in the amount of $3000. The creditors are ordered to pay a total amount of $4800 to the debtor, through his counsel, within thirty days from the date of

this order.

    IT IS SO ORDERED.

Honorable Bianca M. Rucker
United States Bankruptcy Judge
Dated: 12/02/2025

cc;    Vanessa Cash Adams, attorney for debtor
        James R. Baxter, attorney for creditors
        United States Trustee

15